**In the Matter of Almon RAPHAEL, Debtor.**

**Bankruptcy No. 98–18044/JHW.**

United States Bankruptcy Court, D. New Jersey.

Feb. 4, 1999.

Morton Feldman, Atlantic City, NJ, for Debtor.

Marc Alan Krefetz, Deputy Attorney General, Department of Law & Public Safety, Division of Law, Richard J. Hughes Justice Complex, Trenton, NJ, for State of New Jersey.

## *OPINION*

JUDITH H. WIZMUR, Bankruptcy Judge.

In this Chapter 13 case, the debtor proposes to pay municipal court traffic fines through his plan. Presented here is debtor's motion to compel certain municipal courts to rescind their respective suspensions of the debtor's driving privileges by notifying the Division of Motor Vehicles ("DMV") to restore the debtor's driving privileges. The State of New Jersey has filed a special appearance objecting to the debtor's motion, asserting sovereign immunity under the Eleventh Amendment with respect to the DMV, whom the state contends is the real party in interest.

An order dated November 30, 1998, was entered directing that each of the munici-

palities involved, Atlantic City, Bass River, Clementon and Pleasantville, issue an order rescinding the suspension of the debtor's driving privileges, to the extent that the suspension was based on the debtor's failure to pay a court imposed fine. The decision below is rendered to clarify the bases for my earlier determinations in this matter.

## FACTS

The debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code on August 28, 1998. Debtor's Chapter 13 plan proposes to pay $33.40 per month for 36 months as a dividend to unsecured creditors, comprised of the four municipal courts (for traffic and parking fines), the New Jersey Automobile Insurance Surcharge and Collections ("A.I.S.C.") (for motor vehicle surcharges) and the Beneficial Finance Co. (for a personal loan). Debtor's intention is to pay the Internal Revenue Service on a priority claim outside of his plan.

By way of background, debtor explains that he operates motorized equipment at his place of business and desires to regain his driver's license in order to retain his current employment. At the time of the filing of this motion, the debtor believed that his driver's license had been suspended by four different municipal courts. Debtor's schedules indicated that traffic fines were imposed by the municipalities of Absecon[1], Atlantic City, Bass River and Clementon.[2] Proofs of claim have been filed on behalf of each of the municipal courts by the debtor.[3]

All listed creditors, including the four municipalities and the New Jersey A.I.S.C., were noticed with debtor's motion seeking to direct the municipalities to rescind their respective suspensions of the debtor's driving privileges. No opposition was received from any of the municipalities. We note as well

that the New Jersey A.I.S.C. forwarded a notice to the debtor on September 11, 1998, following the filing of his petition, indicating that any suspension of the debtor's driving privileges for the nonpayment of insurance surcharges would be marked "satisfied".

The only objection to the debtor's motion was raised by the State of New Jersey, which responded on behalf of the DMV by way of a special appearance, for the limited purpose of asserting the protection of sovereign immunity under the Eleventh Amendment. The DMV seeks to have the debtor's motion dismissed, relying primarily upon Judge Tuohey's decision in *In re Perez*, 220 B.R. 216 (Bankr.D.N.J.1998), *aff'd*, Civ. No. 98–2043/NHP (D.N.J. August 10, 1998) (unpublished letter opinion).

This matter was considered in court on November 9, 1998, and again on November 16, 1998. At the hearings, I expressed the view that the municipal courts were the real parties in interest in debtor's quest for relief, and that the municipal courts did not have sovereign immunity under the Eleventh Amendment. I recognized debtor's opportunity to treat municipal court fines as unsecured claims in his Chapter 13 plan,[4] and agreed that the automatic stay precluded the conduct of collection activities against the debtor by the municipal courts during the pendency of the case. I also determined that the municipal courts could be directed to rescind any pending suspensions of the debtor's driving privileges which were based on the debtor's failure to pay fines imposed by the municipal courts.

Because further clarification was needed from the debtor regarding the bases of his various suspensions, the matter was adjourned again and reconvened by telephone conference call on November 30, 1998. Following the conference call, on the same day, I

---

1. We accept debtor's representation that listing the City of Absecon was a mistake. It appears that Absecon holds no claim against the debtor.

2. It was represented when the motion was filed that the City of Pleasantville held an outstanding claim against the debtor. Correspondence submitted by the City, dated October 30, 1998, reflects that all outstanding fines had been paid since 1987.

3. Bass River and Atlantic City have filed their own proofs of claim in addition to those filed by the debtor.

4. I draw no conclusions in this opinion about debtor's apparent proposal to favor the claim of one municipality (Bass River) over the claims of the other unsecured creditors, but leave that issue for confirmation.

entered an order directing each of the four municipalities to "issue an order rescinding the suspension of debtor's driving privileges and communicate its issuance to the Division of Motor Vehicles." The rescission applied to any such suspension that was not occasioned by the debtor's failure to appear in response to a summons or a statutory suspension.

During the conference call on November 30, 1998, the State raised an additional issue, asserting that because the District Court had affirmed the *Perez* decision, this court was bound by the conclusions drawn in that decision. The State was afforded an opportunity to supplement the record on this question and I considered the State's arguments in that regard at a hearing on December 7, 1998.

Because of the disjointed state of this record, which includes three court appearances and one conference call, I determined to clarify my rulings in writing.

### DISCUSSION

Three issues are presented for resolution here. First, we must determine whether the Division of Motor Vehicles, an arm of the state, is the real party in interest in this case. Second, we must determine whether the district court's ruling in *In re Perez*, Civ. No. 98–2043/NHP (D.N.J. August 10, 1998) (unpublished letter opinion) is binding on this court. Third, we will consider the issue of whether New Jersey municipal courts are protected from suit in the federal courts by the Eleventh Amendment.

I. *Is the DMV a Real Party in Interest?*

█ The test to determine whether the state is the real party in interest is "if the decision rendered in a case would operate against the sovereign, expending itself on the public treasury, interfering with public administration, or compelling the State to act or refrain from acting." *In re Kish*, 212 B.R. 808, 814 (D.N.J.1997) (citing to *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984)).

Recently, Judge Tuohey, in *In re Perez*, 220 B.R. 216 (Bankr.D.N.J.1998), addressed the same question facing this court today, namely: can a municipal court be compelled to reinstate the driving privileges of a Chapter 13 debtor? Upon reconsideration, Judge Tuohey concluded that he "lack[ed] subject matter jurisdiction to issue orders compelling the restoration of driving privileges, since to do so would interfere with the State of New Jersey's Eleventh Amendment immunity involving licensing practice and procedures, and would, of necessity, impact upon the legal rights of the DMV, an arm of the State." 220 B.R. at 221. Citing to *In re Kish*, 212 B.R. 808 (D.N.J.1997) for the proposition that the State's sovereign immunity extended to the DMV, the court focused on whether or not the DMV was the "real party in interest". Turning to state law, the court explained that:

> under New Jersey law, specifically, N.J.S.A. 39:4–139.10(a), upon the failure to pay a municipal parking judgment, the municipal court is to give notice to the DMV in a manner prescribed by the director, and pursuant to subsection (b), the judge or the director may suspend the driver's license of an individual who has not satisfied outstanding parking violations. Moreover, pursuant to N.J.S.A. 39:4–139.11, when the fine imposed by the municipality has been satisfied, the municipal court is to forward a notice to the DMV to restore the license.

*Id.* at 224.

> The court concluded that:

> From its review of the District Court holding in *Kish*, in light of the above referenced statutes, it is clear to this Court that the DMV is a "real party-in-interest" in this case and clearly entitled to Eleventh Amendment immunity, since a ruling herein concerning restoration of debtor's driving privileges, either through issuance of an order to the municipal courts or directly to the DMV, upon confirmation of a debtor's Chapter 13 Plan, would, of necessity, compel the state to act or refrain from acting.

*Id.* As a result of "the identity of interest between the Director of the DMV and munic-

ipal judges ... as well as the extensive control over motor vehicle licensing procedures exercised by the State of New Jersey," *Perez* determined that "clearly the suspension or restoration of a driver's license, albeit for municipal parking violations, cannot be administered by the municipality independent of the DMV." *Id.* Accordingly, sovereign immunity applied to preclude adjudication of the issue in federal court. *See also In re Burkhardt*, 220 B.R. 837 (Bankr.D.N.J.1998) (subsequent opinion by Judge Tuohey reaching the same conclusion).

■ We readily recognize that the DMV, as an arm of the State, is entitled to Eleventh Amendment sovereign immunity, and we acknowledge the "extensive control over motor vehicle licensing procedures exercised by the State." 220 B.R. at 224. We do not challenge the district court conclusion reached in *Kish* that the DMV is a real party in interest in administering the state's motor vehicle surcharge program. However, we conclude that the DMV is not the real party in interest in this matter.

■ In *Kish*, the debtor was seeking a determination that her Chapter 7 discharge encompassed the motor vehicle surcharges assessed by the DMV. These surcharges are part of a statutory scheme specifically set up to fund the cost of insuring high risk drivers. *See In re Kent*, 190 B.R. 196 (Bankr.D.N.J. 1995). The program is administered by the DMV, a state agency, and assessed directly by the DMV against offending drivers. The resolution of the issue of the dischargeability of surcharges in bankruptcy "would seriously interfere with the public administration of the surcharge program and the ability of high risk drivers to obtain and maintain insurance coverage." 212 B.R. at 813. The

relevant inquiry for Eleventh Amendment purposes is whether a state's potential legal rights are affected. *Kish*, 212 B.R. at 814 n. 5. (citing to *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 904–05, 137 L.Ed.2d 55 (1997)). A determination of dischargeability would affect the state's surcharge program and its opportunity to provide insurance coverage to high risk drivers.

The decision in *Perez* was premised upon the district court's conclusion in *Kish* that the DMV is a "real party in interest" when the DMV's legal right to collect surcharges might be affected by a decision reached in the federal bankruptcy court. In *Perez*, the order compelling the municipal court to direct the DMV to reinstate the debtor's driving privileges was viewed as an order "involving [the state's] licensing practice and procedures". 220 B.R. at 221. An order concerning the restoration of debtor's driving privileges "would, of necessity, compel the state to act or refrain from acting". *Id.* at 224. Therefore, the court concluded that the DMV is a real party in interest on the question of reinstatement.

We believe that a distinction must be drawn between the *Kish* and *Perez* facts. In *Perez*, the debtor's driving privileges were suspended for failure to pay parking fines. Under N.J.S.A. 39:4–139.10(a) [5], upon the driver's failure to pay his municipal court parking fines, the municipal court gives notice to the DMV, and either the judge or the DMV may suspend the driver's license. When the fine has been satisfied, the municipal court provides notice to the DMV, which "shall record the restoration and notify the person of the restoration." N.J.S.A. 39:4–139.11(b) [6]. Restoration is the result of the municipal court's notice to restore, rather

---

**5.** N.J.S.A. 39:4–139.10(a) provides:

If a person has failed to respond to a failure to appear notice or has failed to pay a parking judgment, the municipal court may give notice of that fact to the division in a manner prescribed by the director. If notice has been given under this section of a person's failure to respond to a failure to appear notice or to pay a parking judgment and if the fines and penalties are paid or if the case is dismissed or otherwise disposed of, the municipal court shall promptly give notice to that effect to the division.

**6.** N.J.S.A. 39:4–139.11 provides:

a. When a person whose license has been suspended pursuant to subsection b. of section 9 of this act satisfies the fines and any penalties imposed by the court, the court shall forward to the division a notice to restore the person's driver's license.
b. Upon receiving a notice to restore pursuant to subsection a. of this section, the division shall record the restoration and notify the person of the restoration.

than the consequence of an independent action of the DMV or the exercise by the DMV of any legal right that may be affected. By statute, upon receipt of the notice, the DMV "shall" restore the license. The restoration is nothing more than a ministerial act, and has no impact upon the DMV's oversight of the licensing process or upon the State treasury.

■ Similarly, in this case, debtor's driving privileges were suspended for debtor's failure to comply with the installment orders of Bass River and Clementon to pay traffic fines, N.J.S.A. 39:4–203.2 [7] or N.J.S.A. 2B:12–31(a)(2) [8] (court may suspend driver's license for failure to comply with installment order), and debtor's failure to appear in Atlantic City for a speeding ticket, under either N.J.S.A. 2B:12–31(a)(1) [9] or 39:5–30 [10]. Prior to the entry of the November 30, 1998 order, the debtor appeared in Atlantic City in response to the open ticket, received a fine of $65 and agreed to pay the fine through his Chapter 13 plan.[11] By this court's order of November 30, 1998, the three municipal courts were required to notify the DMV that defendant's driving privileges could be restored, to the extent that the outstanding fines and penalties would be paid through debtor's Chapter 13 plan, pursuant to N.J.S.A. 2B:12–31(e).[12]

Unlike the potential impact of an adverse ruling on the DMV in *Kish*, i.e. the prospect of a restraint imposed against the DMV from collecting surcharges, the DMV acts here simply on the direction of the municipal court to restore driving privileges, as provided in the statute. N.J.S.A. 2B:12–31(e)(1). The DMV is not a party to the suit between the debtor and the municipal court, and is not the subject of a federal court order directing it to act. Rather, the DMV "acts" to restore the debtor's driving privileges as statutorily mandated.[13]

7. N.J.S.A. 39:4–203.2 provides:

If the defendant fails to comply with any of the terms of the installment order, the court may, in addition to any other penalties it may impose, order the suspension of the defendant's driver's license and notify the Director of the Division of Motor Vehicles of the action.

8. N.J.S.A. 2B:12–31(a)(2) provides:

If a defendant sentenced to pay a fine or costs, make restitution, perform community service, serve a term of probation, or do any other act as a condition of that sentence fails to do so, a municipal court may order the suspension of the person's driving privileges or nonresident reciprocity privilege or prohibit the person from receiving or obtaining driving privileges until the terms and conditions of the sentence have been performed or modified.

9. N.J.S.A. 2B:12–31 provides in relevant part:

a. (1) If a defendant charged with a disorderly persons offense, a petty disorderly persons offense, a violation of a municipal ordinance, or a violation of any other law of this State for which a penalty may be imposed fails to appear at any scheduled court proceeding after written notice has been given to said defendant pursuant to the Rules of Court, a municipal court may order the suspension of the person's driving privileges or nonresident reciprocity privilege or prohibit the person from receiving or obtaining driving privileges until the pending matter is adjudicated or otherwise disposed of, except by dismissal for failure of defendant to appear.

10. N.J.S.A. 39:5–30 provides in relevant part:

a. Every registration certificate, every license certificate, every privilege to drive motor vehicles, including commercial motor vehicles as defined in P.L.1990, c. 103 (C.39:3–10.9 et seq.), every endorsement, class of license, and commercial driver license, may be suspended or revoked, and any person may be prohibited from obtaining a driver's license or a registration certificate, or disqualified from obtaining any class of or endorsement on a commercial driver license, and the reciprocity privilege of any nonresident may be suspended or revoked by the director for a violation of any of the provisions of this Title or on any other reasonable grounds, after due notice in writing of such proposed suspension, revocation, disqualification or prohibition and the ground thereof.

11. I note that the order entered November 30, 1998 directing Atlantic City to restore debtor's driving privileges would not have applied to require restoration where debtor's suspension was based on his failure to appear in response to a municipal court summons.

12. N.J.S.A. 2B:12–31 provides:

e. (1) When a defendant whose license has been suspended pursuant to subsection a. of this section satisfies the requirements of that subsection, the municipal court shall forward to the Division of Motor Vehicles a notice to restore the defendant's driving privileges.

13. We do not take up here the different result that might obtain if the Director of the DMV acted as a magistrate under N.J.S.A. 39:5–2 to suspend driving privileges.

We disagree with the *Perez* decision to the extent that it views the payment of municipal court fines as derivative of the DMV's authority and equivalent to the division's assessment and collection of surcharges. An order which compels the municipal courts to rescind their notices of suspension, which recission, by statute, requires the DMV to restore the debtor's driving privileges, cannot be extended to make the DMV a real party in interest. Such an order does not affect the DMV's potential or actual legal rights. The only real party in interest is the municipal court. The DMV is merely carrying out a related administrative task.

## II. *The Binding Nature of the Perez District Court Affirmance.*

By letter opinion dated August 10, 1998, Judge Politan affirmed Judge Tuohey's published opinion in *In re Perez, supra.* Judge Politan determined that "there can be no question that the underlying relief sought [restoration of driving privileges] would operate against the DMV, an agency of the State of New Jersey", slip op. at 3, and would "undeniably expend itself upon the public fisc." *Id.* at 4. Therefore, the claim is barred by the Eleventh Amendment.

The State contends that the District Court decision in *Perez,* resolving substantially the same legal question presented in this case, is controlling here. According to the State, principles of stare decisis, public policy and the need for uniformity require the bankruptcy court to abide by the decisions of the district court. The bankruptcy court should not "disregard a decision from a higher ranking court [because it would be] a disservice [to] the judicial system by making the system more unpredictable and less likely to provide uniform treatment for all litigants."

As we have noted on a prior occasion, in a multi-judge district, "[t]he binding nature of district court rulings upon bankruptcy courts in the same district has been seriously questioned." *In re Kennedy,* 158 B.R. 589, 595 n. 5 (Bankr.D.N.J.1993) (citing to *In re Shattuc Cable Corp.,* 138 B.R. 557, 565–66 (Bankr. N.D.Ill.1992) and *In re Gaylor,* 123 B.R. 236, 242 (Bankr.E.D.Mich.1991)). The Third Circuit recently reflected that

it is clear that there is no such thing as "the law of the district." Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior "resolution of those claims does not bar reconsideration by this Court of similar contentions. The doctrine of stare decisis does not compel one district court judge to follow the decision of another." Where a second judge believes that a different result may obtain, independent analysis is appropriate.

*Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 (3d Cir.1991) (citations omitted). *See also In re Johnson,* 140 B.R. 850, 856 (Bankr.E.D.Pa.1992); *In re Morningstar Enter., Inc.,* 128 B.R. 102, 106 n. 1 (Bankr.E.D.Pa.1991) (adopting *Threadgill* in the bankruptcy context). *Cf. In re Bill Ridgway, Inc.,* 4 B.R. 351, 353 (Bankr.D.N.J.1980) (stare decisis requires the bankruptcy court to follow a federal court decision in the same district). We cannot reconcile the concept that district court judges are not bound by earlier district court opinions with the proposal that bankruptcy court judges, whose decisions are appealable to other district court judges, are bound by such opinions on the same subject.

The majority of courts that have addressed this question have also concluded that the bankruptcy court is not bound by the pronouncement of a single district judge in a multi-judge district. *See, e.g., In re KAR Dev. Assocs.,* 180 B.R. 629 (D.Kan. 1995); *In re 400 Madison Avenue Limited Partnership,* 213 B.R. 888, 890 n. 2 (Bankr. S.D.N.Y.1997); *In re Volpert,* 177 B.R. 81, 85 (Bankr.N.D.Ill.), *aff'd,* 186 B.R. 240 (N.D.Ill. 1995), *aff'd,* 110 F.3d 494 (7th Cir.1997); *In re Barkley 3A Investors, Ltd.,* 175 B.R. 755, 758 (Bankr.D.Kan.1994). *See also* DAVID A. LEVIN, *Precedent and the Assertion of Bankruptcy Court Autonomy: Efficient or Arrogant?,* 12 BANKR. DEV. J. 185 n. 1 (1995) (listing cases).

These courts have concluded alternatively that (1) the bankruptcy court is not a "lower court" for purposes of stare decisis but rather constitutes a unit of the district court; (2) district court decisions are not binding on

other district judges within that district; and/or (3) it is uncertain which district judge within a multi-judge district will hear a given appeal. *See* LEVIN, 12 BANKR. DEV. J. at 196–99. We agree with the well reasoned analysis of Judge Katz in *In re Shattuc Cable Corp.*, 138 B.R. 557 (Bankr.N.D.Ill.1992), as follows:

> [T]he rationale underlying the rule that lower courts are necessarily bound by the decisions of higher courts focuses on the need to avoid voluminous appeals. This reasoning, however, does not apply in the context of the appellate jurisdiction of a multi-judge district court over the bankruptcy courts of that district. It is a well-accepted rule of law that no judge within a district court is bound by the decision of the other district judges.... Thus, unless all judges in a single district have ruled consistently upon the same issue, there will be a strong incentive to appeal from the decisions of the bankruptcy court even if it is deemed bound by a prior district court opinion. Furthermore, in the event of conflicting district court opinions, the bankruptcy court is faced with the problem of determining which is binding. Unlike the Supreme Court or the courts of appeal, the district court does not speak with one voice and thus it cannot be treated as a higher court issuing binding precedent for the bankruptcy courts.

*Id.* at 566–67 (citations omitted).

Other cases have concluded that the bankruptcy court is bound by a decision of any district court judge within the district. *See, e.g., Bryant v. Smith*, 165 B.R. 176 (W.D.Va. 1994); *In re Phipps*, 217 B.R. 427 (Bankr. W.D.N.Y.1998); *In re Muskin, Inc.*, 151 B.R. 252 (Bankr.N.D.Cal.1993) (concluding that the bankruptcy court is bound by a BAP decision); *In re Wright*, 144 B.R. 943 (Bankr. S.D.Ga.1992). However, as was pointed out in *Shattuc*, requiring bankruptcy judges to be bound by a district court opinion in a multi-judge district "would result in allowing the random assignment of cases to a judge to dictate which judge first ruled on any issue and thereby made the binding 'law of the district, even if all the other judges in the district strongly disagreed with the holding'."

138 B.R. at 567 n. 10. Since the Third Circuit in *Threadgill* has made it clear that "there is no such thing as the 'law of the district'", we must decline to follow this line of cases.

The State's position in this regard is overruled. This court is not bound by the District Court affirmance in the *Perez* matter, with which we most respectfully disagree. We turn next to the question of sovereign immunity.

III. *Sovereign Immunity for Municipal Court.*

The municipal courts named herein did not appear in response to debtor's motion to compel them to rescind their respective suspensions of debtor's driving privileges. I reached the issue of sovereign immunity *sua sponte* at oral argument, because it appeared to be relevant to the jurisdiction of this court. *See Sullivan v. Barnett*, 139 F.3d 158, 179 (3d Cir.1998) (sovereign immunity issue should be raised sua sponte where it impacts upon the court's jurisdiction); *Bolden v. Southeastern Pa. Transp. Authority*, 953 F.2d 807, 812 (3d Cir.1991), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992) (court may raise and determine Eleventh Amendment issue where "appropriate" in each case).

██ As our factual recitation indicates, of the five municipal courts referred to in the debtor's petition, schedules and/or other pleadings, two municipalities, Pleasantville and Absecon, have no active claims against the debtor. Two others, Bass River and Atlantic City, have filed proofs of claim in this case and are deemed to have waived sovereign immunity. *See, e.g., In re Burke*, 146 F.3d 1313 (11th Cir.1998) (the filing of a proof of claim waives sovereign immunity); *In re Straight*, 143 F.3d 1387 (10th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998); *In re Fennelly*, 212 B.R. 61, 64 (D.N.J.1997) ("majority rule [is] that filing a proof of claim constitutes a waiver of a State's sovereign immunity"); *In re Christie*, 222 B.R. 64 (Bankr.D.N.J.1998). *See also In re Chen*, 227 B.R. 614, 623 (D.N.J.1998) ("state may still raise the defense of sovereign immunity after filing a proof of claim,

however, the state must do so at the outset"). The only remaining municipal court, Clementon, was directed to forward a rescinding order to the DMV by order dated November 30, 1998 and did so on December 1, 1998.

■ We note that "the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability." *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.), *cert. denied,* 516 U.S. 932, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995). The municipal court of Clementon did not appear in this matter, except that the municipal court notified the DMV to restore the debtor's driving privileges. Nevertheless, we address the question of the Clementon Municipal Court's entitlement to sovereign immunity as the real party in interest here.

■ The Eleventh Amendment provides that:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

This language has been interpreted to include suits by citizens that are residents of the state being sued. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Eleventh Amendment has been construed " 'to stand not so much for what it says, but for the presupposition ... which it confirms.' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996) (quoting *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991)). That presupposition assumes that the states are sovereign entities, and that they are not subject to federal jurisdiction in cases where their own citizens are bringing suit and the State does not consent. *Id.* The type of relief sought is irrelevant. The Eleventh Amendment "serves to avoid 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.' " 517 U.S. 44, 116 S.Ct. at 1124 (quoting *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139,

146, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993)). *See also In re Sacred Heart Hosp. of Norristown,* 133 F.3d 237 (3d Cir.1998).

■ Eleventh Amendment immunity may be triggered even where suit is not brought against the state itself, if the court determines that the state is the "real party in interest". *See Kovats v. Rutgers, the State University,* 822 F.2d 1303 (3d Cir.1987); *Ciba–Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614 (D.N.J.1992). Although the question of what constitutes "the State" or qualifies as an arm or instrumentality of the state is a question of federal law, *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.), *cert. denied,* 516 U.S. 932, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995), the "federal question can be answered only after considering the provisions of state law that define the agency's character." *Regents of the University of California v. John Doe,* 519 U.S. 425, 430 n. 5, 117 S.Ct. 900, 904 n. 5, 137 L.Ed.2d 55 (1997).

■ With respect to municipalities, "the Supreme Court has held since 1890 that counties and similar political subdivisions of the state are not entitled to eleventh amendment immunity, despite the fact that they exercise state power and receive significant amounts of money from the state." *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 661 n. 3 (3d Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989). Thus "it is crystal clear that [counties and municipalities] are not entitled to immunity from suit in federal court." *Id.* at 661 (citing to *Mt. Healthy City School District Bd. of Ed. v. Doyle,* 429 U.S. 274, 280–81, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977)).

The question before this court is whether, for Eleventh Amendment purposes, New Jersey municipal courts should be characterized as an "arm of the state" or as a "nonimmune municipal corporation". *Ciba–Geigy,* 804 F.Supp. at 619.

■ As we have explained above in our discussion of whether the DMV is the real party in interest, the state is the real party in interest, entitled to sovereign immunity,

when " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir.), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989) (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984)). This inquiry has been refined by the Third Circuit as follows:

> [l]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

*Urbano v. Board of Managers*, 415 F.2d 247, 250–51 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970).[14] This "nine factor test" has been rephrased more recently into three categories:

> (1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors- whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized it-

self from responsibility for the agency's debts);

> (2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

> (3) What degree of autonomy the agency has.

*Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir.1989). *See also Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140 (3d Cir.1995); *Peters v. Delaware River Port Authority*, 16 F.3d 1346 (3d Cir.), *cert. denied*, 513 U.S. 811, 115 S.Ct. 62, 130 L.Ed.2d 20 (1994); *Bolden v. Southeastern Pa. Transp. Author.*, 953 F.2d 807 (3d Cir.1991); *In re Kish*, 221 B.R. 118 (Bankr.D.N.J.1998).

We will examine the three *Fitchik* factors as they apply here. The factors are relevant even if the debtor is not asking for damages, but is seeking injunctive relief. *In re Kish*, 221 B.R. 118, 125 (Bankr.D.N.J. 1998) (*Kish III*).

#### A. *Funding.*

The first prong in the *Fitchik* analysis focuses on the source of the funding for the entity in question. Specifically, the court considers: (1) whether payment will come from the state's treasury; (2) whether the entity has the resources to satisfy a judgment; and (3) whether the state is ultimately liable for the entity's debts.

#### 1. *Source of Funding.*

Under New Jersey law, municipal courts are established and funded by their respective municipalities. N.J.S.A. 2B:12–1. Each municipality is required to provide "[s]uitable courtrooms, chambers, offices, equipment and supplies for the municipal court, its administrator's office and its violations bureau." N.J.S.A. 2B:12–15. The municipal court judges' salaries are set and paid for by the

---

**14.** The Third Circuit in *Fitchik* noted that the element of whether or not the entity was exercising a governmental or proprietary function is no longer a valid criterion in light of *Garcia v. San*

*Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). 873 F.2d at 659 n. 2.

municipality. N.J.S.A. 2B:12–7. The municipality is also responsible for the compensation for the court administrator and all other court employees. N.J.S.A. 2B:12–10. In addition, both the judges and the court administrators are required to be bonded, payable to the municipality, county and the State, in an amount and with terms set by the municipality. N.J.S.A. 2B:12–12; N.J.A.C. 5:30–8.4 (setting minimum surety bond requirements for municipal judges and administrators).

In 1993, the New Jersey state legislature adopted the State Judicial Unification Act ("the Act"), which shifted the administrative costs of the county judicial system to the State. *See* N.J. Constit. Art. 6, § 8, ¶ 1; N.J.S.A. 2B:10–2. This Act (and corresponding constitutional amendment) required the State to pay for all judicial costs, designated all judicial employees as employees of the State, and directed all judicial fees to be paid to the State treasury. N.J.S.A. 2B:10–4. The Act does not disturb the statutory scheme of funding by the municipalities of their respective municipal court operations.[15] In fact, the revised statutory scheme contained in N.J.S.A. 2B:12–1 *et seq.*, enacted two months following the Act,[16] reaffirmed the central role of the municipalities in maintaining primary responsibility for the funding of the operations of the municipal courts.

Supplementing the funding of municipal courts from the budget of each respective municipality are the fines and penalties collected by the municipal courts. While the amount of the municipal fines that can be assessed by the court is set by state statute, *see, e.g.*, N.J.S.A. 22A:2–43 (Fees in Municipal Courts); N.J.S.A. 22A:3–4 (Fees for Criminal Proceedings), the fines imposed are paid to the municipality, and unless otherwise provided for by law, deposited in the municipality's treasury. N.J.S.A. 2C:46–4 (Fines, assessments and restitution; collec-

tion; disposition); N.J.Ct.R. 7:14–4 (Financial Control). With regard to motor vehicle fines or penalties under Title 39, Motor Vehicles and Traffic Regulations, the moneys collected by the municipal court are distributed to the municipality, county and state, in accordance with the nature of the violation. N.J.S.A. 39:5–40 and 5–41(b). The moneys distributed to the municipality may "be used by the municipality for general municipal use and to defray the cost of operating the municipal court". N.J.S.A. 39:5–41(b).

Several statutory provisions require a court cost assessment by the municipal court, collectible by the municipal court and payable directly to the state treasury. *See, e.g.*, N.J.S.A. 39:5–41(d) ($1.00 assessment for each Title 39 violation to be deposited, through the State Treasurer, into the "Body Armor Replacement Fund"), and N.J.S.A. 22A:3–4 ($2.00 court cost assessment for deposit into the Automated Traffic System Fund and a $.50 court cost assessment for deposit into the "Emergency Medical Technician Training Fund").

As to moneys collected by the municipal court for Title 39 violations and for court cost assessments that are distributed to the state, an order or judgment against the municipal court impacting upon the transmission of funds from the municipal court to the state treasury would clearly affect the state treasury. However, we believe that such a remote and deminimus impact does not trigger sovereign immunity for several reasons. First, every case we have reviewed that has examined the funding issue in the context of sovereign immunity has focused on the potential liability of the state treasury for the debts of the entity, rather than on the collection of moneys into the state treasury. *See, e.g., In re Fitchik*, 873 F.2d at 660; *In re Christy*, 54 F.3d at 1145. Second, other institutions, including munici-

---

**15.** Judicial costs are defined as costs previously incurred by the counties, N.J.S.A. 2B:10–3(c), with no mention of municipal court costs. The Act defines a judicial employee as a county employee, N.J.S.A. 2B:10–3(d), again with no mention of municipal court employees. Judicial fees are defined as any fees or court costs collected by the judiciary. N.J.S.A. 2B:10–3(e). A specific exclusion is provided for any fines allocated to

"municipalities for offenses within the jurisdiction of municipal courts." *Id.*

**16.** The State Judicial Unification Act, N.J.S.A. 2B:12–1 *et seq.*, was enacted pursuant to L.1993, c. 275, § 2 effective December 6, 1993. Chapter 12 of Title 2B, pertaining to municipal courts was adopted pursuant to L.1993, c. 293, § 1 effective February 15, 1994.

palities, also perform functions on behalf of the state and do not attain sovereign immunity thereby. *In re Decalcomania Mfg. Corp.*, 142 B.R. 670, 673 (citing to *S.J. Groves & Sons Co. v. New Jersey Turnpike Authority*, 268 F.Supp. 568, 574 (D.N.J.1967) (Counties and municipalities do not partake of the Eleventh Amendment immunity enjoyed by the states, although they clearly are public bodies and in many cases perform functions on behalf of the state)).

We conclude that under New Jersey law, each municipality is fundamentally responsible for funding their respective municipal court operations.

### 2. *Resources to Satisfy a Judgment.*

The purpose of determining the resources of a municipal court to satisfy a judgment is to ascertain whether there is a prospect that the municipal court would seek assistance from the state to satisfy a judgment against it. We note first that both the municipal court judge and municipal court administrator are bonded for certain claims against them. N.J.S.A. 5:30–8.4. Otherwise, we have no specific information in this record regarding the ability, or lack thereof, of the Clementon Municipal Court, or any other similarly situated municipal court, to satisfy a potential judgment against it.

Similarly, in *Christy,* the court did not know how much money the Pennsylvania Turnpike Commission would have available to it to satisfy a potential judgment against it. The court determined that "[s]ince the Commission bears the burden of proving its entitlement to Eleventh Amendment immunity, the Commission's failure to provide pertinent information regarding its ability, or lack thereof, to satisfy a potential judgment against it simply means that the Commission has failed to sustain its burden of proof on this important question." *Christy,* 54 F.3d at 1146.

More significantly, courts have consistently held that where the public entity has the power to raise funding from sources other than the state, then the entity would not need to seek state assistance to satisfy a judgment against it. In *Mt. Healthy City School District Board of Ed. v. Doyle,* 429

U.S. at 280–81, 97 S.Ct. at 572–573, the Supreme Court determined that a city board of education is not an arm of the state entitled to Eleventh Amendment immunity, at least in part because the board had the power to raise its own funding. More recently, in *Christy,* the Third Circuit confirmed that "an entity with power to raise revenues by raising fares need not request funds from the state to meet shortfalls caused by adverse judgments." *In re Christy,* 54 F.3d at 1146. *See also In re Fitchik,* 873 F.2d at 661 (The opportunity of New Jersey Transit Corporation (NJT) to raise revenues by raising rates sheds doubt on the need of NJT to request funds from the state coffers in order to meet shortfalls caused by adverse judgments.)

We have outlined above that New Jersey municipal courts are funded primarily by their respective municipalities. New Jersey municipalities are separate taxing entities, N.J.S.A. 54:5–104.30, with the opportunity to raise revenues by raising local taxes to provide for sufficient funding for all municipal services, including municipal courts. There is no basis to believe that a municipal court would look to the state to satisfy a judgment against it.

### 3. *State Liability For Debts of Municipal Court.*

Finally, on the funding factor, we have found no basis to conclude that the state has assumed liability for the funding and/or debts of the municipal courts. We concluded above that the state specifically undertook financial responsibility for state courts in the 1993 State Judicial Unification Act, N.J.S.A. 2B:10–1 *et seq.,* but the state did not undertake financial responsibility in any way for municipal courts. We have found no provision which expressly immunizes the state from responsibility for the potential debts of municipal courts. However, the Circuit has determined that the absence of a blanket disclaimer is not significant. *Christy,* 54 F.3d at 1147. "What is significant . . . is the fact that the [Pennsylvania Turnpike] Commission has failed to establish that Pennsylvania is under any affirmative obligation to pay the Commission's unassumed liabilities in the first place." *Id.* The Circuit has also

remarked that the "state legislature might feel compelled as a practical matter to subsidize a variety of entities that provide necessary services, including financially pressed municipalities. Such discretionary subsidies committed in reaction to a judgment, however, would not necessarily transform the recipients into alter egos of the state." *Bolden*, 953 F.2d at 819.

On this record, there is no support for the proposition that a judgment against a municipal court would be equivalent to a judgment against the treasury of the State of New Jersey, that the municipal courts lack financial resources sufficient to pay potential adverse judgments, or that the State would be obligated to cover any such potential judgment against a municipal court. The funding factor weighs heavily against a finding of sovereign immunity from suit in federal court for the municipal courts.

B. *Status under State Law.*

The second *Fitchik* element concerns whether "state law treats an agency as independent, or as a surrogate for the state". 873 F.2d at 662. *Christy*, 54 F.3d at 1148. In evaluating this factor, courts have considered such aspects as whether the entity has a separate corporate existence; whether it has the capacity to sue or be sued; whether it is exempt from state taxation; whether it has the power to enter into contracts; and whether it is subject to the New Jersey Tort Claims Act. *See, e.g., Bolden*, 953 F.2d at 820; *Fitchik*, 873 F.2d at 662.

As we explored above with respect to funding, municipal courts are separate from other state courts. They are established by individual municipalities, each of which has a separate corporate existence and does not have sovereign immunity protection under the Eleventh Amendment. However, the exercise of judicial power by the municipal courts is derived from the judicial function of the state and controlled by the judicial authority of the state, situating the municipal court, for purposes of this element, as more closely akin to an arm of the state. *K.D. v.*

*Bozarth*, 313 N.J.Super. 561, 713 A.2d 546 (App.Div.), *certif. denied*, 156 N.J. 425, 719 A.2d 1023 (1998).

 Under the New Jersey Constitution, "The judicial power shall be vested in a Supreme Court, County Courts and inferior courts of limited jurisdiction." Art. VI, § 1, par. 1. The municipal court is an inferior court of limited jurisdiction within the contemplation of the Constitution. *Kagan v. Caroselli*, 30 N.J. 371, 377, 153 A.2d 17 (1959). Rather than exercising the 'judicial' power, authority, or duty of a municipality, the municipal court shares in the state's judicial power, *Id.*, and is an "integral part of the statewide judicial system". *Knight v. Margate*, 86 N.J. 374, 385, 431 A.2d 833 (1981).

As a "public entity" responsible to serve a public purpose, whether viewed as a municipal creation or as a state entity, the municipal courts are not subject to taxation. *See* N.J.S.A. 54:4–3.3 (municipal property used for public purpose not subject to taxation); *City of East Orange v. Livingston Tp.*, 102 N.J.Super. 512, 246 A.2d 178 (Law Div.1968), *aff'd*, 54 N.J. 96, 253 A.2d 546 (1969). Likewise, as a "public entity", the municipal courts and their employees are subject to tort suits only under the provisions of the New Jersey Tort Claims Act. N.J.S.A. 59:1–3.[17]

We are cautioned by the Circuit in *Fitchik* to be wary of factors such as the New Jersey Tort Claims Act, immunity from state property tax, and the power of eminent domain, factors which tend to favor a finding of alter ego status, to conclude that the public entity is an arm of the state of sovereign immunity purposes.

> For example, the New Jersey Tort Claims Act applies to New Jersey municipalities and counties as well, and those entities are not accorded sovereign immunity.... And the fact that NJT [New Jersey Transit] has the power of eminent domain, and thus exercises "a slice of state power" does not mean that it is necessarily entitled to eleventh amendment immunity. Significantly,

---

**17.** The Tort Claims Act defines a "public entity" to include "the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State." N.J.S.A. 59:1–3

New Jersey counties and municipalities also have the power of eminent domain, as do privately owned public utilities of every kind.

*In re Fitchik,* 873 F.2d at 663 (citations omitted).

Nevertheless, New Jersey municipal courts, which are undeniably and constitutionally an integral part of the statewide judicial system, are more closely akin to arms of the state. On balance, the "status under state law" test favors the contention that municipal courts are entitled to sovereign immunity.

### C. *Autonomy.*

The final *Fitchik* factor concerns the relative autonomy of the entity claiming sovereign immunity. In evaluating this element, courts have generally considered the degree of independence that the entity has from state supervision. *See, e.g., Peters,* 16 F.3d at 1351–52; *Bolden,* 953 F.2d at 820; *Fitchik,* 873 F.2d at 663–64; *Kovats v. Rutgers, the State University,* 822 F.2d 1303, 1311 (3d Cir.1987).

As we noted under our discussion of the funding category, under New Jersey law, each municipality is required to: (1) provide courtrooms and equipment for the court, N.J.S.A. 2B:12–15; (2) appoint municipal court judges, N.J.S.A. 2B:12–4; (3) set and pay the municipal court judges' salaries, N.J.S.A. 2B:12–7; (4) set and pay the compensation for the court administrator and all other court employees, N.J.S.A. 2B:12–10; and (5) provide for bonds for both the judges and the court administrators, N.J.S.A. 2B:12–12. The facilities and financial structure are therefore established by the municipality rather than the state. These factors illustrate a certain degree of autonomy and weigh against sovereign immunity.

However, the New Jersey Supreme Court exercises significant control over municipal courts. The New Jersey Constitution places the administrative control of the municipal courts in the Supreme Court and the Chief Justice, in Art. VI, § 2, par. 3 ("The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in

all such courts."), and in Art. VI, § 7, par. 1 ("The Chief Justice shall be the administrative head of all the courts in the State."). *Kagan v. Caroselli,* 30 N.J. at 379, 153 A.2d 17. *See* N.J. COURT RULES, Part VII, Rules Governing Practice in the Municipal Courts.

The statutory framework for municipal courts, N.J.S.A. 2B:12–1 *et seq.,* sets out various types of state control over municipal court operations. A municipality may increase the number of judgeships of the municipal court or appoint temporary municipal judges only with the written consent of the Assignment Judge of the vicinage. N.J.S.A. 2B:12–5. The Assignment Judge of the vicinage may appoint an acting judge of a municipal court for cause. N.J.S.A. 2B:12–6. The Chief Justice of the Supreme Court may designate a presiding judge of the municipal courts for each vicinage. N.J.S.A. 2B:12–9. The Supreme Court establishes procedures to certify municipal court administrators. N.J.S.A. 2B:12–11.

Although the power to appoint municipal judges lies with each municipality, N.J.S.A. 2B:12–15, a factor which favors autonomy from state control in other contexts, *see, e.g., In re Christy,* 54 F.3d at 1149 ("State authority over the appointment of [Pennsylvania Turnpike] Commission members lends obvious support to a finding of sovereignty."), that power is far less significant here to advance the autonomy of municipal courts from state control. "[T]he power to appoint did not make the functions of a magistrate a phase of local government. Rather, in exercising the appointive power, the governing body acts merely as a statutory agent." *Kagan v. Caroselli,* 30 N.J. at 379, 153 A.2d 17.

The New Jersey Supreme Court has emphasized the authority of the court to control the practice and procedure in all New Jersey courts, including municipal courts.

The power of the Supreme Court in the judicial domain flows from and is vested by organic law. It is necessarily paramount and exclusive as to matters that are central to the judiciary. The Court's authority with respect to the administration of the courts is far-reaching; it encompasses the entire judicial structure and necessarily

covers all aspects and incidents related to the justice system.

*Knight v. Margate*, 86 N.J. at 387, 431 A.2d 833 (Citation omitted). The Supreme Court's "paramount and exclusive" power extends to the governing of the conduct of municipal court judges. *Id.* "There is no room for divided authority. The constitutional plan assures to the magistrate independence of local government and the 1948 statute was designed to preserve it." *Kagan v. Caroselli*, 30 N.J. at 379. *See also K.D. v. Bozarth*, 313 N.J.Super. at 573, 713 A.2d 546 (the adjudicatory role of a municipal court is governed by state law and court rules).

On balance, because the New Jersey Supreme Court exercises significant control over municipal courts, we conclude that the autonomy factor weighs in favor of sovereign immunity. *See, e.g., Christy*, 54 F.3d at 1149–50 (Significant control held by the state over the power to appoint Commission members favored sovereign immunity on the autonomy question); *Bolden*, 953 F.2d at 820 (the court found the autonomy factor to be weaker than in *Fitchik*, because the state exercised less control); *Fitchik*, 873 F.2d at 663–64 (court found that the autonomy factor tilted slightly in favor of sovereign immunity for New Jersey Transit because the governor had significant control over the agency's actions).

D. *Conclusion.*

■ We are left to balance *Fitchik* factors both for and against sovereign immunity. We have determined that the funding factor weighs heavily against sovereign immunity, while the status and autonomy factors weigh in favor of the conclusion that New Jersey municipal courts are alter egos of the state. In reconciling these factors, we recognize that the "vast majority of Circuits ... have concluded that the state treasury factor is the most important factor to be considered ... and, in practice, have generally accorded this factor dispositive weight." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 49, 115 S.Ct. 394, 405, 130 L.Ed.2d 245 (1994) (citation omitted). *Bolden*, 953 F.2d at 819; *Fitchik*, 873 F.2d at 659–60 (whether the judgment is paid from

the state treasury is the most important factor); *Urbano*, 415 F.2d at 251 (funding is the most significant factor). "The special emphasis ... upon the funding factor is supported by the Eleventh Amendment's central goal: the prevention of federal court judgments that must be paid out of the State's treasury." *Christy*, 54 F.3d at 1145.

■ We conclude that the funding element in this case outweighs the status and autonomy factors. A suit against a New Jersey municipal court is not a suit against the State of New Jersey. In New Jersey, the municipal courts are financially independent of the state. The state has no affirmative obligation to pay the liabilities incurred by the municipal courts. Although the state recently assumed the responsibility for the expenses and liabilities of other state courts by constitutional amendment and legislative enactment, the municipalities remain financially responsible for their respective municipal courts.

To be distinguished here is the determination of Judge Fox that the Philadelphia Traffic Court is an entity of the Commonwealth of Pennsylvania entitled to assert Eleventh Amendment immunity. *In re Colon*, 114 B.R. 890, 893 (Bankr.E.D.Pa.1990). While the "unified judicial system" established by the Pennsylvania Constitution, of which the Philadelphia Traffic Court is a part, is similar to the New Jersey constitutional framework as to municipal courts, the funding sources for the Philadelphia Traffic Court differ in significant respects. The salaries of the court's judges are determined by state statute and paid by the state. *Id.* While the operating costs are currently paid by the city, the Pennsylvania Supreme Court held "that it is the duty of the Commonwealth to pay for these expenses. *County of Allegheny v. Commonwealth*, 517 Pa. 65, 534 A.2d 760 (1987)." *Id. See also Franceschi v. Schwartz*, 57 F.3d 828 (9th Cir.1995) (the California municipal court is an arm of state under California case law).

We believe that, on balance, a judgment or order directed to a New Jersey municipal court is more akin to a judgment against a non-immune municipality rather than a judgment against the state, and does not have

"essentially the same practical consequences as a judgment against the State itself." *In re Fitchik*, 873 F.2d at 658. Accordingly, we conclude that the Clementon Municipal Court does not have sovereign immunity under the Eleventh Amendment and is subject to suit in federal court.[18]

The order previously entered in this case will remain undisturbed.

---

**18.** We need not address here the well-established principle that judges, including municipal court judges, are absolutely immune from liability for their judicial acts. *K.D. v. Bozarth*, 313 N.J.Super. at 568, 713 A.2d 546.